RICHARD P. CARTER *vs.* WARREN FIVE CENTS SAVINGS
BANK.

Essex. October 3, 1990. - January 9, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Contract*, Employment. *Employment*, Severance agreement, Demotion.
*Bank. Trust Company. Practice, Civil*, Attorney's fees.

General Laws c. 172, § 14, providing that officers elected by a bank's
   board of directors "shall hold their respective offices during the pleasure
   of the directors," did not forbid the payment of a lump sum severance
   compensation to an officer of a bank upon his resignation in circum-
   stances in which the bank, under a severance agreement, had agreed to
   pay the officer the equivalent of almost three years' compensation, if,
   after a change of control of the bank, the officer resigned following
   what he, in good faith, judged to be a demotion and in which the of-
   ficer, following the bank's merger, claimed that changes in his duties
   after the merger triggered his right to resign. [75-77]
In an action by an officer of a bank seeking recovery from the bank under
   a severance agreement providing that, if, after a change of control of
   the bank (there was a merger), the plaintiff resigned following what he,
   in good faith, judged to be a demotion, he would be entitled to sever-
   ance compensation, there was a dispute of material fact, foreclosing the
   entry of summary judgment, concerning whether the plaintiff made a
   good faith judgment that his duties after the change of ownership
   changed significantly so as to constitute a demotion. [77-79]
An officer of a bank who sought recovery of compensation under a sever-
   ance agreement with the bank was entitled to recover attorney's fees
   under the express terms of the severance agreement and, in such a cir-
   cumstance, a Superior Court judge could not properly award less than
   the attorney's fees incurred by the officer without a ruling, supported by
   explicit findings of fact, that the fees incurred were unreasonable. [79-
   80]

CIVIL ACTION commenced in the Superior Court Depart-
ment on November 18, 1988.

The case was heard by *John T. Ronan*, J., on motions for summary judgment.

The Supreme Judicial Court granted a request for direct appellate review.

*Richard L. Neumeier* (*Paul M. Moretti* with him) for the plaintiff.

*Wilfred J. Benoit, Jr.* (*Daniel R. Deutsch* with him) for the defendant.

WILKINS, J. The plaintiff (Carter), a former vice-president of the defendant (Warren Five), seeks recovery under a June 23, 1986, severance agreement between Carter and the Beverly Savings Bank (Beverly). On August 1, 1988, Warren Five acquired Beverly by merger and thereby assumed Beverly's obligations to Carter, who had been the senior vice-president of Beverly. Following the merger, Warren Five proposed to adjust Carter's responsibilities. Carter claims that changes in his duties after the merger triggered his right to resign, as he did on August 1, 1988, and to obtain amounts due under the severance agreement. The agreement provided that, if the obligation to pay arose, Carter was entitled to one dollar less than three times his average annual compensation over the five most recent years.

A judge of the Superior Court allowed Carter's motion for summary judgment and subsequently allowed his motion for attorney's fees but, without explanation, reduced the amount. Each party has appealed.

Warren Five argues that G. L. c. 172, § 14 (1988 ed.), forbids the payment of lump sum compensation on termination of the employment of an officer of a bank like Warren Five and thus bars Carter's claim. We reject this argument. We do, however, agree with Warren Five that there is a dispute of material fact, foreclosing the entry of summary judgment, concerning whether conditions have occurred that triggered Warren Five's obligation to pay Carter under the severance agreement. We also conclude that Carter is entitled to recover attorney's fees under the express terms of his severance agreement and that, in such a circumstance, the judge could not properly award less than the attorney's fees

charged to Carter without a ruling, supported by explicit findings of fact, that the fees charged were unreasonable.

1. The bank argues that, because G. L. c. 172, § 14, provides that officers elected by the bank's board of directors "shall hold their respective offices during the pleasure of the directors," the provision in Carter's severance agreement for the payment of a lump sum on "termination of his employment," as defined in that agreement, is unenforceable. This court might well conclude that, if a bank governed by § 14 discharged an officer who had a contract for his services for a fixed term, the bank would not be liable to that employee for the compensation agreed on for the balance of the term of the contract. Such is the nearly universal result in cases involving analogous language appearing both in the National Banking Act (12 U.S.C. § 24 [Fifth] [1982] [the bank's directors may dismiss officers "at pleasure"])[1] and in certain State statutes.[2] The reasoning behind the general rule is that no inhibition on a board's exercise of its pleasure to discharge an officer should be tolerated and that an obligation to pay future salary on the termination of an officer's employment would be such an inhibition.

The question before us is whether the general principle just expressed, assuming it were this court's view of the scope of § 14, should be applied to Carter's severance agreement and thus invalidate the bank's agreement to pay Carter the equivalent of almost three years' compensation, if, after a

---

[1]See *Mackey* v. *Pioneer Nat'l Bank*, 867 F.2d 520, 524 (9th Cir. 1989), and authorities cited ("An agreement which attempts to circumvent the complete discretion of a national bank's board of directors to terminate an officer at will is void as against public policy"); *Rohde* v. *First Deposit Nat'l Bank*, 127 N.H. 107, 109 (1985) ("To hold on the one hand that contracts for employment of national bank officers cannot provide for guaranteed salaries for fixed periods of time in contravention of the bank's right to immediately discharge the officer, and on the other hand that such contracts can provide as a condition precedent to discharge that an officer is entitled to 36 months' salary, would be to elevate form over substance and render the language of 12 U.S.C. § 24, para. Fifth meaningless").

[2]See, e.g., *Little* v. *American State Bank of Dearborn*, 263 Mich. 645, 647-648 (1933); *Citizens Bank of Hayti* v. *Wells*, 269 Mo. 190, 193 (1916).

change of control, Carter resigned following what he, in good faith, judged to be a demotion. In effect, we must decide whether a bank subject to § 14 is forbidden from offering enforceable "golden parachutes"[3] to its officers.[4]

When the language now appearing in § 14 was first adopted in this State, circumstances were different. There were no golden parachutes. We are unwilling to read into a statute that says nothing explicitly about executive compensation a rule that invalidates an arm's-length transaction entered into to benefit the bank, by encouraging a key executive to stay in its employ in the face of the uncertain consequences of a possible merger of the employer-bank into another entity.

We are not dealing here with a demotion or discharge made for cause or due to financial constraints, reasons that would typically result from directors' action taken to protect the interests of a bank. Rather, in order to allay Carter's concerns about his future employment if the employer-bank were not to survive any merger and were not to retain his services during the transition (and beyond) and to encourage his continued employment, Beverly entered into the separation agreement with him. See *Koenings* v. *Joseph Schlitz Brewing Co.*, 126 Wis. 2d 349, 370-371 (1985).

The Warren Five was fully aware of Carter's severance agreement and those of other Beverly officers. As part of the merger, other officers waived the change of control provisions of their severance agreements. Carter did not. The Warren Five understood that it would be liable to Carter if it demoted him, as defined in the agreement, after a change in the ownership of Beverly. The Warren Five is entitled to argue that conditions triggering its severance obligations to Carter have not occurred (a point we come to next), but § 14 does not invalidate those severance obligations. We are

---

[3]See *Schreiber* v. *Burlington Northern, Inc.*, 472 U.S. 1, 3 n. 2 (1985).

[4]Carter does not argue that, because his agreement was entered into before Beverly Savings Bank converted from a mutual savings bank to a stock savings bank subject to § 14, § 14 does not apply.

strengthened in our view of the limited reach of § 14 by the absence of any case invalidating a similar agreement under the cognate Federal and State statutes.[5]

2. The crucial issue under the terms of Carter's severance agreement is whether, in Carter's good faith judgment, there was a significant change in his responsibilities or duties after the merger. The severance agreement provides that, if certain events occur within seven years after a change of control of Beverly (there was such a change), Carter may resign his employment and receive severance compensation. The only event on which Carter relies is that set forth in the agreement as follows: "in the judgment of the Executive (such judgment being exercised in good faith), a significant change in the Executive's responsibilities and/or duties which constitutes, when compared to the Executive's responsibilities and/ or duties before the 'change of control' . . . , a demotion."

To recover, Carter must have made a good faith judgment that there was a significant change in his duties or responsibilities that constituted a demotion. Warren Five argues that Carter may recover only if in good faith he resigned because of the demotion. The reason for Carter's resignation is not referred to in his severance agreement.[6] The sole issue con-

---

[5] If to protect its finances there were a strong public objective that no bank governed by G. L. c. 172 should be bound by an employment contract providing, in effect, for compensation upon discharge of an employee without cause, § 14, which by its terms applies only to bank officers, does not achieve that objective.

The bank did not terminate Carter as an officer and, therefore, it might be argued that § 14 has no application to this case. We have, however, for the purposes of our discussion of § 14, treated the alleged demotion, as defined by agreement, as the equivalent of a discharge.

[6] We agree with Warren Five that Carter's motivation in resigning presents an issue of disputed fact on the summary judgment record, but that fact is not material to any legal issue that must be decided under the severance agreement. Carter's motivations in resigning may be relevant, however, to whether in good faith he exercised his judgment concerning the alleged demotion.

cerning good faith is whether Carter in good faith judged that he had been demoted.[7]

The question is whether Carter believed, subjectively and in good faith, that he had been demoted. If he did, he is entitled to recover. If, however, he did not believe in good faith that he had been demoted but rather used the circumstances to claim a demotion and to resign, he is not entitled to recover. In deciding whether Carter exercised his judgment in good faith, the perception of the circumstances by a reasonable person in Carter's position is relevant. If such a reasonable person would not have regarded the change as a demotion, Carter would have to prove that he nevertheless did so regard it. On the other hand, the fact that a reasonable person in Carter's position would conclude that he was demoted would tend to support the good faith of his subjective judgment on the issue.

The evidence in the summary judgment record shows a dispute of material fact concerning whether Carter made a good faith judgment that his duties after the change of ownership changed significantly so as to constitute a demotion. Clearly, Warren Five changed the duties that Carter was to perform after the merger. Carter had been Beverly's only senior vice-president. He was responsible for residential real estate lending, including construction lending (which represented about half of Beverly's lending activity), commercial lending, commercial real estate, consumer lending, loan servicing and joint ventures. He had approximately thirty-five people reporting to him. It was proposed that Carter would be one of Beverly's four senior vice-presidents and its senior residential lending officer, with responsibility for all residen-

---

[7]An employee's right to severance pay following a demotion could be conditioned on his resigning because of a good faith determination that he had been demoted. See *Worth* v. *Huntington Bancshares, Inc.*, 43 Ohio St. 3d 192, 195 (1989), ("In the event that Employee should determine in good faith that his status or responsibilities with the [employer] has or have diminished subsequent to a change in control, and shall *for that reason* resign from his employment . . . within two years after such change in control, Employee shall be entitled to receive all of the payments and enjoy all of the benefits specified in Section 2 hereof" (emphasis supplied).

tial real estate mortgage loans and construction lending (almost half of Warren Five's premerger lending activity), and for four real estate joint ventures. The real estate mortgage loans of the merged banks would total more than Beverly's entire loan portfolio, a fact Carter did not know when he made his decision. He would have only approximately twelve people reporting to him. Residential real estate lending involves less decision making than commercial lending. There is a disagreement concerning how much contact Carter would have had with Warren Five's executive committee. There is also a basis on the record for concluding that Carter did not fully know the details of his proposed new position with Warren Five when he resigned on the date the merger was effective.

In an affidavit, the president of Warren Five states that Carter told him, before the new positions at Warren Five were announced, that he was investigating a job as an officer in another savings bank, saying that he was more comfortable working for a mutual bank, which would provide more job security than a publicly traded bank, and that the new bank would be nearer to his summer home. Carter substantially confirmed the conversation but not its date. There is evidence that Carter initiated discussions with an executive search business in January, 1988, before his duties in the merged bank were disclosed.

The bank argues that Carter's new position was not a demotion by any reasonable standard and that Carter's judgment that it was a demotion was not made in good faith. On the record Carter has not demonstrated that there is no dispute of material fact bearing on the question whether he made a good faith judgment that his duties had changed so as to constitute a demotion.

3. We turn finally to the question whether Carter is entitled to attorney's fees under the severance agreement, and, if so, whether the judge was warranted in allowing attorney's fees in an amount less than Carter was charged for legal services.

There is no doubt that the parties may provide in an agreement that, in certain circumstances, one of them may be obligated to pay the other's attorney's fees, incurred in asserting rights under the agreement. See *Hannon* v. *Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 827 (1982); *Penney* v. *First Nat'l Bank of Boston*, 385 Mass. 715, 723 (1982); *Financial Acceptance Corp.* v. *Garvey*, 9 Mass. App. Ct. 94, 97 (1980); *Worth* v. *Huntington Bancshares, Inc.*, 43 Ohio St. 3d 192, 199 (1989). Here, Beverly proposed an agreement, which Carter (who had no hand in the formulation of the agreement) accepted. The bank agreed, in what it now calls an "extraordinary provision," that it would pay "[a]ny legal expenses incurred by the Executive in enforcing his rights (regardless of whether . . . the Executive prevails on the merits of his claim(s)) under this Agreement." We see no reason why the bank should not be held to the terms of its bargain, even if (as is not yet established) Carter loses this case. Surely, Carter's contentions are not so frivolous as to support a claim that public policy should bar him from recovering attorney's fees incurred in pursuing his claim.

The agreement was to pay attorney's fees Carter incurred in pursuing his rights. The agreement was not to pay Carter's reasonable attorney's fees as determined by a judge. The judge awarded Carter attorney's fees in an amount less than the total charges incurred by Carter. We do not know why the judge did so because he made no findings. We would accept the right of the bank to challenge the amount of Carter's legal fees (a matter of indifference to Carter as long as the bank is solvent) either on the ground that the legal services were not incurred in enforcing his rights or on the ground that the charges were above the highest level of a reasonable fee for those services. The subject of legal fees must be considered further in the Superior Court.

4. The case is remanded for further consideration in light of this opinion. The order concerning Carter's attorney's fees is vacated. Carter is entitled to recover attorney's fees incurred in this appeal, the amount of which is, however, sub-

ject to consideration in the Superior Court to the extent provided in this opinion.

*So ordered.*